IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SAFA, et al., | : | |
|     Plaintiffs | : | CIVIL ACTION |
| | : | |
|     v. | : | |
| | : | |
| CITY OF PHILADELPHIA, et al. | : | NO. 2:13-cv-5007-DS |
|     Defendants. | : | |

## MEMORANDUM OPINION

DAVIR R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                                    May  29, 2015

## I.        INTRODUCTION

Plaintiffs, Imad Safa ("Imad") and Mohammad Safa ("Mohammad") (collectively, "the Safa

brothers" or "the brothers") along with their company, Exotic Diamond Jewelers of Philadelphia,

LLC ("Exotic Diamond Jewelers"), brought this action against Defendants, the City of Philadelphia

("the City"), Detective Frank Straup ("Straup"), a number of John Doe defendants, United Express

Jewelry, Israel Nisanov, Gabriel Nisanov, Yellow Gold, Inc., Italy in Gold Star, Inc., Aslan

Bawabeh, David Bawabeh, Gerald Schembri, G.S. Consultant Group, Inc., Hillel Jack Attali, and

Haviv Kassab seeking monetary relief relating to a series of events that culminated in criminal

charges being lodged against the Safas.[1]  The parties have consented to magistrate judge jurisdiction.

 (Doc. No. 82.)    All Defendants except Detective Straup and the City of Philadelphia (the

---

[1] Plaintiffs have also sued a number of John and Jane Doe defendants.  Discovery has ended and Plaintiffs have made no effort to identify these parties or assert that any additional parties could be found liable for the torts they have complained of.  Accordingly, we find that these John and Jane Doe Defendants must be dismissed.  *See Blakeslee v. Clinton Cnty.*, 336 F. App'x 248, 250 (3d Cir. 2009) (internal citations omitted) (dismissing John Doe defendants after reasonable discovery when Plaintiff failed to amend her complaint to replace said defendants with named parties); *see also Joobeen v. City of Philadelphia Police Dep't*, No. CIV.A. 09-1376, 2011 WL 710219, at *1 (E.D. Pa. Feb. 28, 2011) (dismissing John Doe defendants sua sponte); *Silverstein v. Percudani*, 422 F. Supp. 2d

*(continued...)*

"Defendants") have settled or have otherwise been dismissed from the action. (Doc. No. 91.) Presently before the Court is their Motion for Summary Judgment, ("MSJ," Doc. No. 94), "Plaintiffs' Memorandum of Law in Opposition to the Defendant's [sic] Motion for Summary Judgment," ("Resp.," Doc. No. 97), and "Defendants' Reply Brief in Support of Their Motion for Summary Judgment." ("Reply," Doc. No. 100.) For the reasons set forth below, we will grant their motion.

## II.    PROCEDURAL HISTORY

On August 6, 2013, Plaintiffs filed their Complaint in the Court of Common Pleas of Philadelphia County. (Doc. No.1) On August 26, 2013, the case was removed to the Eastern District of Pennsylvania given the existence of federal question jurisdiction. (*Id*.) On September 18, 2013, Plaintiffs filed their First Amended Complaint, (Doc. No. 14). On March 24, 2014, they filed a Second Amended Complaint, (Doc. No. 39). Finally, on January 12, 2015, they filed a Third Amended Complaint. [2] (Doc. No. 90.) In that the Defendants' Motion addresses only the liability of the City and Straup, the following recitation of the Complaint will address the claims against just these two defendants.

Plaintiffs assert that Straup is liable for a variety of constitutional claims under 42 U.S.C. § 1983 ("Section 1983") including malicious prosecution, unlawful arrest, unlawful search and seizure, conspiracy, and First Amendment retaliation. Plaintiffs have also pursued state law torts claims of malicious prosecution, false imprisonment and unlawful arrest, conspiracy, intentional

_____

468, 473 n. 3 (M.D. Pa.) *aff'd*, 207 F. App'x 238 (3d Cir. 2006) (where no allegations against John Doe defendants were offered, court dismissed claims against them sua sponte); *see generally* Fed. R. Civ. P. 21.

[2] The Third Amended Complaint is the final complaint in this action and thus supersedes all others. *W. Run Student Hous. Associates, LLC v. Huntington Nat. Bank*, 712 F.3d 165, 171 (3d Cir. 2013) (quoting *New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*, 101 F.3d 1492, 1504 (3d Cir. 1996). Accordingly, all citations to "the Complaint" refer to the Third Amended Complaint.

infliction of emotional distress, assault and battery, and conversion. (Compl., ¶ 131-161, 187-208.)  The brothers claim that the city is liable for malicious prosecution and intentional infliction of emotional distress under Pennsylvania law, for the Section 1983 claims under a theory of *Monell* liability[3], and for "[c]onspiracy as to [c]riminal [c]harges" under state law.[4] (Compl., ¶ 136-140, 158-161, 187-198.)  We note that Plaintiffs, in their Response and as confirmed at oral argument, have stipulated to the dismissal of their assault and battery, intentional infliction of emotional distress, and conspiracy claims.  (Resp., at 13-14.)  We also note that Plaintiffs' *Monell* and malicious prosecution claims against the City were effectively abandoned in that the Plaintiffs have not opposed the Motion for Summary Judgment as to those claims.[5]  These abandoned claims are dismissed.  Accordingly, the remainder of this opinion only addresses the claims against Straup.

The essence of the Complaint as concerns Straup is predicated upon the notion that a number of jewelry wholesalers, who had placed jewelry with Plaintiffs' father on "memo" or consignment, had conspired to use the Philadelphia police to obtain a return of that jewelry and money owed on those transactions by pursuing criminal charges against the Plaintiffs, who they suspected had possession of the jewelry and were selling it in their shop.  Straup is said to be complicit by knowingly or recklessly pursuing a search, seizure, arrest, and criminal charges against the brothers.

The Defendants filed their Motion for Summary Judgment on February 13, 2015.  (MSJ,

---

[3] This claim is premised on the Supreme Court's holding in *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), which established that "municipalities and other local government units" could be held liable, under certain circumstances, through Section 1983.  *Id.* at 690.

[4] While the Complaint claims that the City is also liable for conversion, Judge Baylson already dismissed this claim with prejudice and thus we need not consider it at this stage.  (Doc. No. 55, 56.)

[5] In their Response, Plaintiffs state that there are no remaining claims against the City.  Plaintiffs confirmed this

*(continued…)*

Doc. No. 94.) Plaintiffs filed a responsive brief opposing Defendants' Motion on March 13, 2015. (Resp., Doc. No. 97.) Defendants filed their Reply on April 10, 2015. (Reply, Doc. No. 100.) We held oral argument on May 13, 2015. The claims that remain are ripe for resolution.

### III.     FACTUAL BACKGROUND[6]

#### A.     The Key Actors

Given the number of parties originally named in this litigation, we begin our factual discussion with a description of the individuals and businesses whose actions are elemental to the disposition of this Motion. The Plaintiffs, Imad and Mohammad Safa, are brothers. They run Exotic Diamond Jewelers, a retail jewelry store, in Philadelphia. They had previously been involved in the jewelry business with their father, Jamal Safa, who ran New Diamond City,[7] a retail jewelry store in the Bronx, New York.

A number of New York City jewelry wholesalers did business with New Diamond City. They included Aslan and David Bawabeh of Italy in Gold Star Inc.; Haviv Kassab of Yellow Gold, Inc.; Israel and Gabriel Nisanov of United Express Jewelry; Boris Gulkarov of ABG, Inc.; Rafakov Alverz of L & A Jewelry; Arkadiy Gabrilou of United A&S Jewelry; Yakoub Sarbar of Sardell Jewelry, Inc.; Elie Hanond of Elegant Jewelry Inc.; Diamond Kingdom; and Renee Design Inc.

#### B.     The Wholesalers & New Diamond City

New Diamond City received jewelry items from the wholesalers through a process certain of the parties have referred to as "consignment" but which, as became clear during this litigation, differs

---

position at oral argument. We will dismiss these remaining claims with prejudice.

[6] In light of the "no genuine dispute as to any material fact" standard of summary judgment, for purposes of this opinion, the following recitation of facts emphasizes those which are supportive of or relevant to Plaintiffs' own claims, notwithstanding the fact that Defendants dispute much of these allegations. Fed. R. Civ. P. 56(a).

[7] While New Diamond City apparently operated under a number of different corporate names, for the sake of consistency we will refer to it simply as New Diamond City.

slightly from a conventional consignment relationship. The wholesalers would place their jewelry with New Diamond City with the understanding that they would be merchandised at the New Diamond City shop and the wholesalers would be paid for the goods in installments. (Kassab Dep., at 22-25.) It was also understood that if the wholesalers wanted their goods returned, they could call upon New Diamond City to return them in the more traditional consignment manner. (*Id.*) These arrangements were memorialized in documents that varied as to descriptiveness and sophistication. (Kassab Dep., at 28, Doc. No. 94-14 to 94-19.) For the sake of brevity and consistency, we refer to these arrangements as "consignment" as that is how the parties have characterized them.

The wholesalers claimed that by the early Spring of 2010, they had consigned hundreds of thousands of dollars' worth of merchandise to New Diamond City and that New Diamond City stopped making payments on the consigned goods. (Kassab Dep., at 41-42; D. Bawabeh Dep., at 15-16). The wholesalers then found that the store had unexpectedly shuttered and Jamal Safa had left for Lebanon. (Imad Dep., at 19.) The wholesalers met to determine how best to resolve the debt incurred by New Diamond City and, in April 2010, retained counsel and a private investigator, Gerald Schembri, to aid in the recovery of the merchandise. (Nisanov Dep., 34-37.)

Meanwhile, in early 2011, Imad and Mohammad opened their store, Exotic Diamond Jewelers, on South Street in Philadelphia. (Imad Dep., at 21.) At about the same time, through the efforts of Schembri and an associate of Gabriel Nisanov, the wholesalers learned that the brothers had opened the Philadelphia store which they understood contained a quantity of the jewelry they had consigned to New Diamond City. (Nisanov Dep., at 37, 41-44.) The wholesalers believed that the brothers used that same inventory they had consigned, or part of it, to start their Philadelphia business. (*Id.*, at 41; Kassab Dep., at 43.)

Schembri contacted the Philadelphia Police at some point in April 2011. (Straup Dep., at

16.)  He was put in contact with Detective Straup who began a criminal investigation, where he interviewed witnesses, gathered documents, visited the store, and applied for the warrants that are the subject matter of this lawsuit.  (*Id.*, at 16-31; Doc. No. 94-4, Doc. No. 94-5, Doc. No. 94-6.)

### C.     The Search Warrant

Straup then prepared a search warrant which contained his affidavit of three and a half pages briefly setting out his experience in "investigating white collar crimes" for some 13 years prior to 2010 and generally making reference to specialized training he had dealing with white collar crime. (Doc. No. 94-4.)

He described his contact with Schembri and certain of the wholesalers.  As set out in his affidavit, Straup reported, based on information from the wholesalers, that they had placed substantial quantities of jewelry on consignment with New Diamond City.  (*Id.*)  Straup explained that at the end of March 2010, New Diamond City had become seriously delinquent in its payments, that the shop closed, and that the "owners disappeared taking with them all of the jewelry that was consigned to them by the ten [wholesalers]."  (*Id.*)  Straup then related that these wholesalers had "design[ed] and create[d] their own jewelry line and therefore most of the items [were] one of a kind and unique to the individual designers."  (*Id.*) He also set out that he had been provided with receipts for "all of the consigned jewelry."  (*Id.*)

Straup then went on and gave summaries of specific interviews that he undertook with three of the wholesalers, Gabriel Nisanov of United Express Jewelry, Rafakov Avnerz of L & A Jewelry, and Boris Gulkarov of ABG, Inc.  (*Id.*)  The affidavit sets out that Nisanov told Straup that, in early 2010, he (Nisanov) had provided additional jewelry to "Mike and Mark" – Americanized names used by the plaintiffs – given their previously reliable payment history.  (*Id.*)  Despite this history, Nisanov claimed that New Diamond City had  accumulated outstanding delinquencies in excess of

$160,000.  (*Id.*)  Straup then reported that Nisanov detailed how the store had closed and he had lost contact with the owners until he later "learned that the owners of New Diamond City were going to open a store at 316 South Street in Philadelphia."  (*Id.*)  Nisanov's partner went to the store in May of 2011 and, as Nisanov told Straup, this partner identified several unique pieces of Nisanov's jewelry on display in the store, which still had their tags appended to them.  (*Id.*)  Photographs were taken of that jewelry and these photographs, as reported in the affidavit, were shown to Straup as were catalogs which showed his merchandise.  (*Id.*)  Straup confirmed the information by visiting the store and saw for himself jewelry that appeared to match that of photos provided by Nisanov.  (*Id.*)

The affidavit goes on by including a summary of the statements that Straup took of Boris Gulkarov, the owner of ABG, Inc.  (*Id.*)  As reflected in the affidavit, Gulkarov told Straup that he had an outstanding balance with New Diamond City of some $6,770 and that he was pursuing collection in March 2010 when "Mark" requested an additional $36,503 in jewelry.  (*Id.*)  Gulkarov rejected this request until Mark paid him on the outstanding consignment.  (*Id.*)  Gulkarov returned the next day and was now told that Jamal Safa had to make an emergency trip to Lebanon to attend to Mark's ill grandfather.  (*Id.*)  Mark then told Gulkarov to come back at the end of the month when he would be paid.  (*Id.*)  Gulkarov returned at the end of the month and found the business closed. (*Id.*)  He was unable to track down the owners.  (*Id.*)  Gulkarov provided Detective Straup with descriptions of some of the jewelry items he had with New Diamond City.  (*Id.*)

The affidavit also summarized Straup's interview with Rafakov Avnerz of L & A Jewelry. (*Id.*)  As set out in the affidavit, Avnerz similarly reported to Straup that he had placed about $35,000 in outstanding balances with New Diamond City when he was contacted in March of 2010 by Mark and asked for additional merchandise.  (*Id.*)  Avnerz told Mark that he would not provide the requested jewelry, valued at approximately $15,000, given the outstanding balance of $35,000.  (*Id.*)

Mark assured him that New Diamond City would pay the remainder of the balance once his father returned from Lebanon. (*Id.*) Consequently, Avnerz delivered an additional quantity of jewelry on March 4, 2010. (*Id.*) Avnerz returned to the store two weeks later and found that the store was closed and the owners had disappeared. (*Id.*) He later learned about the Philadelphia store. (*Id.*) He then went to the store and asked the Safa brothers to pay the obligation or return the merchandise but the two brothers "laughed at him and made him leave." (*Id.*) Detective Straup concluded his affidavit by indicating that he "checked with the Pennsylvania Department of State and learned that Exotic Diamond Jewelers of Philadelphia, LLC was registered on 3-7-11 with a business office at 523 South 4th Street." (*Id.*)

Straup first sought and obtained the approval of an Assistant District Attorney for the warrant application. (Straup Dep., at 102-03.) Upon receiving that approval, Straup swore to the affidavit of probable cause on June 16, 2011 and the search warrant was issued by a judicial officer the same day. (Doc. No. 94-4.)

### D.     The Search & Seizure

Straup then executed the search and seizure the next day. (Straup Dep., at 36.) Two police officers and two other detectives accompanied him with eight of the wholesalers. (*Id.* at 36, 40, 45.) Straup testified that it was important that he have the wholesalers present in order to identify the jewelry. (*Id.* at 36.) At the start of the search, the Safa brothers claim that Straup stated "we could do this the easy way, we could do this the hard way. You pay [the wholesalers] half of what they are owed and that will be the end of it." (Imad Dep., at 39.) Imad claims to have declined the bargain. (*Id.*)

Straup began the search by bringing Nisanov into the store to identify his items, which were said to be unique and easy to identify. (Straup Dep., at 37-38). It took three hours for Nisanov to

pick out his items and for the police to record what was being seized. (*Id.* at 40.) Straup then decided, in the interest of time, to bring in the remainder of the wholesalers to see if they could identify items more quickly. (*Id.*) Straup determined he could match any identified items to invoices at a later date. (*Id.*) At one point during the execution of the warrant, one of the wholesalers claimed possession of items that the Safas proved they had purchased elsewhere. (Mohammad Dep., at 102-04.) Another wholesaler was identifying items in an indiscriminate fashion. (Straup Dep. at 42.) Straup excused both of them, Avnerz and Gulkarov, from the store. (*Id.*) The record yields no evidence showing that the police retained any items that the two had claimed ownership of or that either had any other role in the investigation after being ejected from the store. (Doc. No. 94-5; 94-6; Police Property Receipts, Doc. No. 94-25.) Plaintiffs do not contend otherwise.

### E. The Arrest Warrants

The next week, over the course of two days, the remaining six wholesalers met with Straup to substantiate their ownership of the items, matching them to the invoices. (Straup Dep., at 45-47.) Based on the evidence before him, Straup determined ownership on different factors: some were claimed to be unique designs, some had numbered tags which matched to invoice descriptions, some had numbers that matched to a photographic index or catalogue, while others had been stamped with identifiers that corresponded to the wholesalers' corporate names. (*Id.* at 45-50.)

After the seizure, the Safas made complaints to the Philadelphia Police both via phone and in writing alleging that Straup had performed an improper and "false [i]nvestigation." (Imad Dep., at 53-60; Doc. No. 33.) A follow-up complaint was filed in person with Internal Affairs on June 21, 2011. (Doc. No. 33.) Straup testified that he was unaware of these complaints before the arrest of the Brothers, but also testified that when such complaints are made, he would ordinarily be interviewed in connection with them. (Straup Dep., at 54.)

Straup prepared two nearly identical[8] affidavits of probable cause for the arrests of the Safa brothers for theft by unlawful taking, theft by deception, receiving stolen property, failure to make required disposition of funds received, deceptive practices, and criminal conspiracy. (Doc. No. 94-5; 94-6.) The warrant applications, with their affidavits, were approved by the District Attorney's office. (Straup Dep., at 104.) He then swore to the two applications and affidavits before the judicial officer who issued the warrants on July 12, 2011. (Doc. No. 94-5; 94-6.)

In these affidavits, Straup summarized interviews he had with the six complainant wholesalers. (*Id.*) He noted that in February and March of 2010, he was told that the Safa brothers had increased their requests for jewelry from the wholesalers and, subsequently, additional jewelry was provided by some of the wholesalers. (*Id.*). In March, the brothers began to make "various excuses" for not paying their vendors and, at the end of that month, New Diamond City was closed and the consigned jewelry nowhere to be found. (*Id.*) No effort was made to return the jewelry to the wholesalers. (*Id.*) Certain of the wholesalers explained that after the closing, they spoke with the

---

[8] The only substantive differences between the affidavits is the references to which brother is described as the proposed object of arrest. Moreover, there is a criminal complaint in the docket concerning Imad Safa with a supplemental page describing his alleged acts. (Doc. No. 94-5; 94-6.) This supplemental page reads as follows:

> IN A CONTINUING COURSE OF CONDUCT, THE DEFENDANT, IN CONCERT WITH ANOTHER/OTHERS,TOOK JEWELRY ON CONSIGNMENT BY DECEPTION AS A COURSE OF HIS BUSINESS, FROM THE COMPLAINANT, GA[B]RIEL NISANOV, IN THE AMOUNT OF $164,593.80, AND FAILED TO RETURN IT TO HIM, CLOSING HIS BUSINESS IN NEW YORK, COMING TO PHILADELPHIA,AND SETTING UP A NEW BUSINESS CALLED EXOTIC DIAMOND JEWELERS AT 316 SOUTH STREET,WHERE HE ATTEMPTED TO SELL THE COMPLAINANT'S JEWELRY FOR A PROFIT FOR HIMSELF WITHOUT THE COMPLAINANT'S KNOWLEDGE OR CONSENT AND WITH NO INTENTION OF PAYING BACK THE COMPLAINANT FOR THE JEWELRY OBTAINED BY FRAUD/DECEPTION.

(Doc. No. 94-6) (capitalization in original). Insofar as this is a mere summation of the remainder of the affidavit, we do not find that the analysis as concerns the arrest of and charges levied against either Plaintiff differs.

Safas and that Jamal Safa claimed that his sons had taken the jewelry, melted it down for cash, and lost all the proceeds gambling in Atlantic City, which the sons then denied. (*Id.*) Straup stated that the brothers later opened Exotic Diamond Jewelers in Philadelphia and thereafter certain of the wholesalers observed their consigned jewelry, which was described as unique, in the window, "[s]ome with the [wholesalers'] tags still attached" to the merchandise. (*Id.*) Straup explained that following the search and seizure, 491 items were seized and that the majority of each of the six wholesalers' items were matched to the invoices provided to Straup. (*Id.*) He also stated that all the wholesalers had identified the men at the Philadelphia store as the same brothers they had dealt with at New Diamond City. (*Id.*)

On July 13, 2011, the day after the issuance of the warrants, the brothers were taken into custody. (Imad Dep., at 51, 140.) Straup claims he was not present at the time of arrest. (Straup Dep., at 94). The brothers claim otherwise. (Imad Dep., at 52-53; Mohammad Dep., at 110.) Imad Safa testified that Straup showed up at his business and said "[s]ince you had made various calls to various police officials and made complaints I have to arrest you now." (Imad Dep., at 52-53.) Mohammad testified that their bail was set at one million dollars, however there is no documentation in the record as to the bail amount. (Mohammad Dep., at 164.) Imad was confined for five days and his brother for six, until they were each able to make bail and were released from custody. (Imad Dep., at 140-41; Mohammad Dep., at 164.)

The criminal case against the Safas was ultimately dropped by the prosecutor due to the failure of some of the wholesalers to appear in court. (Straup Dep., at 55.) Various of the wholesalers as well as Mohammad Safa filed Motions for Return of Property in 2012. *Commw., Ex. Rel. United Express Jewelry v. City of Philadelphia*, 1853 EDA 2013, slip op. at 2 (Pa. Super. Aug. 26, 2013.) The proceeding was resolved in favor of Mohammad Safa who was awarded a return of

the items that were seized by the police in June 2011. *Id.* at 3. Plaintiffs claim that when the items were returned, certain pieces were missing, including three rings, which were in total valued at about $100,000. (Mohammad Dep., at 45-46.) The brothers testified that they sold a small quantity of the items returned to them but claim to have melted down or "scrapped" a substantial amount for money or to manufacture the melted metal into new items. (Imad Dep., at 49, 127, 142; Mohammad Dep., at 49-50.)

## IV.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (a court must grant a motion for summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.") An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the case under the governing law." *Id.* In reviewing the record before us, any "inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). However, "[i]f the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

Subject to the familiar burden shifting framework of summary judgment, the movant bears the initial burden of showing why summary judgment should be granted in its favor. *See Celotex,* 477 U.S. at 423. Upon meeting that burden, "the burden then shifts to the non-movant to establish

that summary judgment is inappropriate." *Connection Training Servs. v. City of Philadelphia*, 358 F. App'x 315, 318 (3d Cir. 2009) (non-precedential) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). This requires that "the non-movant . . . go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial." *Id.* (citing *Celotex,* 477 U.S. at 324); *see also Williams v. Borough of W. Chester, Pa.*, 891 F.2d 458, 460 (3d Cir. 1989) (on summary judgment "a nonmoving party must adduce more than a mere scintilla of evidence in its favor and cannot simply reassert factually unsupported allegations contained in its pleadings") (citations omitted). In so doing, "a plaintiff cannot resist a properly supported motion for summary judgment merely by restating the allegations of his complaint, but must point to concrete evidence in the record that supports each and every essential element of his case." *Orsatti v. New Jersey State Police*, 71 F.3d 480, 484 (3d Cir. 1995); *see also Oxford Investments, L.P. v. City of Philadelphia*, 21 F.Supp.3d 442, 448 (E.D. Pa. May 15, 2014) (the party opposing summary judgment is required to cite to specific evidence to meet their burden); *see generally* Fed. R. Civ. P. 56(c)(3) ("[t]he court need consider only the cited materials").

## V.    DISCUSSION

We begin with the issue of probable cause and misrepresentations in the warrants, in that our resolution of those issues determines whether summary judgment should be granted as to the claims of malicious prosection, unlawful arrest, false imprisonment, unjustified search and seizure, and First Amendment retaliation. We then address the state law conversion claim.[9]

---

[9] In their brief the Safas rely heavily on Judge Paul Patrick's findings from this earlier civil case concerning whether the Safas or certain of the wholesalers showed superior title to the goods. Such findings are inadmissible hearsay. *E.g., Thompson v. Glenmede Trust Co.*, No. CIV. A. 92-5233, 1996 WL 529693, at *2 (E.D. Pa. Sept. 17, 1996) ("It is black letter law that a court decision is inadmissible as hearsay.") (citations omitted)). Nor do any of Judge Patrick's findings trigger the application of claim or issue preclusion. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 n. 5 (1979) ("Under the doctrine of res judicata [also called claim preclusion], a judgment on the merits in a prior suit bars a second
*(continued...)*

## A.  Search and Seizure

In considering whether a search is unjustified ("illegal" or "unlawful"), the Supreme Court has held that "[f]irst, all searches and seizures must be reasonable.  Second, a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity."  *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011) (citing *Payton v. New York*, 445 U.S. 573 (1980)); *see also United States v. Place*, 462 U.S. 696, 701 (1983) ("[i]n the ordinary case, the [Supreme] Court has viewed a seizure of personal property as *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized.")  It is the case that "[a] magistrate judge may find probable cause when, viewing the totality of the circumstances, 'there is a *fair probability* that contraband or evidence of a crime will be found in a particular place,'" *United States v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (emphasis added)), and that "[a] police officer has probable cause to conduct a search when the facts available to [him] would warrant a [person] of reasonable caution in the belief that contraband or evidence of a crime is present."  *Florida v. Harris*, 133 S. Ct. 1050, 1055 (2013) (internal quotations omitted).

---

suit involving the same parties or their privies based on the same cause of action."); *Ashe v. Swenson*, 397 U.S. 436, 442 (1970) (collateral estoppel, also known as issue preclusion, generally "bars relitigation between the same parties of issues actually determined at a previous trial."); *Gregory v. Chehi*, 843 F.2d 111, 117-20 (3d Cir. 1988) (under Pennsylvania law, which applies in Federal cases where a prior state judgment is implicated, for claim preclusion to apply "[t]he two actions must share an identity of the (1) thing sued on; (2) cause of action; (3) persons and parties to the action; and (4) quality or capacity of the parties suing or sued . . . [while for issue preclusion to apply it must be the case that] '1. The issue decided in the prior adjudication was identical with the one presented in the later action; 2. There was a final judgment on the merits; 3. The party against whom the plea is asserted was a party or in privity with a party to the prior adjudication; and 4. The party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in the prior action.'"); *Burlington N. R. Co. v. Hyundai Merch. Marine Co.*, 63 F.3d 1227, 1232 (3d Cir. 1995) (discussing the application of non-mutual collateral estoppel). Accordingly, we cannot consider Judge Patrick's findings.

When a warrant, on its face, establishes probable cause, a litigant must show that the defendant "knowingly and deliberately, or with a reckless disregard for the truth", made false statements or omission which are "material, or necessary, to the finding of probable cause." *Warner v. McCunney*, No. CIV.A. 05-1248, 2005 WL 2811738, at *3 (E.D. Pa. Oct. 27, 2005) *aff'd*, 259 F. App'x 476 (3d Cir. 2008) (quoting *Wilson v. Russo*, 212 F.3d 781, 786 (3d Cir. 2000)). Our Court of Appeals has held that "[t]he question [of probable cause] is for the jury only if there is sufficient evidence whereby a jury could reasonably find that the police officers did not have probable cause to arrest."[10] *Sharrar v. Felsing*, 128 F.3d 810, 818 (3d Cir. 1997) (citing *Deary v. Three Un-named Police Officers*, 746 F.2d 185, 192 (3d Cir. 1984)); *see also Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997). We now address whether Plaintiffs have made the requisite showing of an absence of probable cause for the search and seizure.

Straup argues that probable cause was established and that Plaintiffs have failed to offer any evidence to show that he intentionally or recklessly provided any material untruth or omitted any material facts from the affidavit that could support a finding of liability. (MSJ, at 11.). The Safas respond that Straup omitted his lack of expertise in the jewelry business in the affidavit and that he mistakenly stated that the brothers owned the business, that Imad was the father, and that the Safas disappeared from New York and fled to Philadelphia with the merchandise. (Resp., at 3-4, 8.) Further, they argue that Straup did not have receipts to prove that that the jewelry was owned by the wholesalers and that, notwithstanding these issues, probable cause was otherwise lacking. (*Id.*)

---

[10] We note that in malicious prosecution cases, "[i]n contrast to the Court's § 1983 analysis where probable cause is a question of fact, under Pennsylvania law, probable cause is a question of law for the court to decide." *Clifton v. Borough of Eddystone*, 824 F. Supp. 2d 617, 634 n. 7 (E.D. Pa. 2011) (addressing probable cause under federal and state causes of action for malicious prosecution); *see also Baird v. Aluminum Seal Co.*, 250 F.2d 595, 601 (3d Cir. 1957) ("Under Pennsylvania law the issue of the existence of probable cause, upon facts clearly shown, is ordinarily a question for the court.").

To resolve this question we start with a review of the warrant. In doing so, we note that the affidavit recites the general allegations of the wholesalers that were reported to him by Schembri, as well as detailed summaries of interviews Straup personally took with three of the wholesalers. (Doc. No. 94-4.) Straup then describes the documents substantiating the wholesalers' claims, sets outs Plaintiffs' course of conduct of converting to their own use goods consigned to them by the wholesalers, and details his own visit to the store to confirm the wholesalers' allegations. (*Id*.) We have no difficulty finding that the affidavit on its face establishes "a fair probability that contraband or evidence of a crime w[ould] be found" at Exotic Diamond Jewelers. *Gates*, 462 U.S. at 214.

We now turn to whether there is sufficient evidence whereby a reasonable jury could find that Straup intentionally or recklessly made certain misrepresentations or omissions in the affidavit that were material to a finding of probable cause. In the affidavit of probable cause, Straup explained that he:

> [h]as been a Philadelphia Police officer since 1973 and a Detective since 1980, currently assigned to Southern Detective Division. The affiant has experience investigating white collar crimes, has made many arrests and garnered convictions for these types of offenses. The affiant has been assigned exclusively to investigating white collar crimes for the last [t]hirteen (13) years and participated in specialized training dealing with white collar crimes with local, state and federal law enforcement agencies.

(Search Affidavit, Doc. No. 94-4, 2.)

Plaintiffs argue that Straup "intentionally omitted . . . that he did not have the experience, training, or knowledge pertaining to diamonds, gold, or any jewelry involved in the Safa investigation." (Resp. at 3.) We agree with Plantiffs that Straup did not include any reference to his experience in dealing with diamonds, gold, and jewelry. We accept Plaintiffs' assertion that Straup's

experience in this area is limited.  We decline, however, to conclude that probable cause is lacking

merely because of this omission.

The fact that the detective was not an expert in jewelry is not material to whether

probable cause existed considering the extent of evidence presented to Straup and memorialized

in the affidavit. [11]  What is important are the interviews he had with the wholesalers, the

documents he was provided, and the fact that his preliminary investigatory visit to the Safas'

storefront had yielded evidence of the conversion.  We conclude that there was a "fair

probability" that a search of the store would yield "contraband or evidence of a crime."  *Hodge*,

246 F.3d at 305 (internal quotations omitted).

In the affidavit, Straup stated that "New Diamond City was owned and operated by a

male named Imad Safa and his two sons, who have [M]usli[m] names but went by their

American names of Mike and Mark."  (Search Affidavit, Doc. No. 94-4, at 2.)  Plaintiffs claim

that this was in error in that Imad had no ownership interest in New Diamond City and Jamal, not

Imad, was the patriarch.  (Resp., at 3.)  Again, we do not find the alleged errors to be material.

Straup was provided information that "Mike and Mark", who the wholesalers claimed were the

pseudonyms of the brothers who they had had personally dealt with  at New Diamond City in

---

[11] When facts in an affidavit are erroneous or certain facts are omitted:

> [a court] focus[es], then, on whether any of the affirmatively false statements or
> omissions are material to the finding of probable cause. Under *Franks* [*v.
> Delaware*], falsehoods are deemed material to the finding of probable cause if
> the affidavit, "with the ... false material set to one side ... is insufficient to
> establish probable cause." *Franks v. Delaware,* 438 U.S. 154, 156 (1978). Thus,
> we proceed to remove the falsehoods from the affidavit that was submitted to the
> . . . judge, and then, to determine whether Plaintiff has shown there to be a
> genuine factual dispute as to the reformulated affidavit's sufficiency to establish
> probable cause.

*Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997).

New York, had later resurfaced in Philadelphia allegedly selling the very goods  the wholesalers claimed to have placed with them on consignment.  The affidavit clearly sets this out and any misstatement as to the name of the father is immaterial.

Similarly, the question of whether the sons had an ownership interest in New Diamond City[12] is immaterial.  The issue was whether the Safa brothers appeared in Philadelphia with items which were claimed to be the property of the wholesalers, allegedly obtained via a fraudulent scheme they participated in.

Plaintiffs also point to the fact that Straup stated that the owners of New Diamond City "disappeared" in March 2010 with the wholesalers' merchandise.  (Resp., at 3-4.)  Plaintiffs argue that the use of the word "disappeared" is a misrepresentation insofar as the brothers had resurfaced in Philadelphia and thus had not "disappeared."  (*Id.* at 4.)  We do not find this to be a falsity, let alone material.  The word "disappeared" was clearly a reference to the fact that New Diamond City had closed without any warning to the wholesalers, a fact that is not in contention. Moreover, the affidavit read as a whole makes clear that the Safa brothers had not disappeared in the sense that they argue because the affidavit is entirely premised on the fact that the sons had *reappeared* in Philadelphia operating a new shop.  (Search Affidavit, Doc. No. 94-4.)  Had the

---

[12]  In their Reply, Defendants have provided a transcript from an interview with Mohammad Safa taken in relation to an unrelated insurance claim.  (Doc. No. 100-1.)  In this interview, Mohammad Safa admitted that he and his brother, along with their parents, were the owners of New Diamond City.  (Doc. No. 100-1, at 1.)  We will not consider this evidence in that it was presented to us for the first time in the Reply.  *See Alston v. Forsyth*, 379 F. App'x 126, 129 (3d Cir. 2010) (non-precedential) ("There is cause for concern where a movant presents new arguments or evidence for the first time in a summary judgment reply brief, particularly if the District Court intends to rely upon that new information in granting summary judgment to the movant."); *see also Black v. TIC Inv. Corp.*, 900 F.2d 112, 116 (7th Cir. 1990) ("Where new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the movant an opportunity to respond." (citing *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 409-10 (1st Cir. 1984))); *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (following the Seventh Circuit's holding in *Black*); *c.f. Troso v. City of Atl. City*, No. 10-CV-1566 RMB/JS, 2013 WL 1314738, at *3 (D.N.J. Mar. 28, 2013) ( "Courts ordinarily either decline to consider arguments raised for the first time in a reply brief or afford the non-movant the opportunity to file a sur-reply brief before granting summary judgment on a newly raised basis."); *Filer v. Foster Wheeler LLC*, 994 F. Supp. 2d 679, 692 (E.D. Pa. 2014) (refusing to address arguments raised

*(continued…)*

brothers in fact not reappeared in Philadelphia, no search or investigation would have ever

occurred.  A rational fact-finder could not find that this statement was materially false.

Finally, Plaintiffs argue that Straup erroneously stated that he was in possession of the

wholesalers' receipts[13] which reflected items they consigned to New Diamond City.  (Resp., at

8.)  However, Plaintiffs again do not meet their burden on summary judgment in that they have

failed to cite to any evidence to show that Straup was not in possession of any of these receipts.[14]

 *See El v. Southeastern Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007) (mere allegations are

insufficient to oppose summary judgment); *Domenech*, 2009 WL 1109316, at *5 ("When the

burden [of summary judgment] shifts to the nonmoving party, it imposes an affirmative

obligation to identify the relevant evidence it has adduced." (citing *Caisse Nationale de Credit

Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir.1996))); *Oxford Investments, L.P. v.

City of Philadelphia*, 21 F.Supp.3d 442 , 448 (E.D. Pa. May 15, 2014) (in opposing summary

judgment, a litigant "must cite specific evidence in the record and may not, 'rest solely on

assertions made in the pleadings, legal memoranda, or oral argument'"  (quoting *Berckeley Inv.

Group, Ltd. V. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006))); *see also Herman v. City of Chicago,

870 F.2d 400, 404 (7th Cir. 1989)* ("A district court need not scour the record to make the case of

_____

for the first time in a reply brief).

[13] In the evidence before us, there are a large number of *invoices*, from several different wholesalers, showing goods consigned to New Diamond City and which are cross-referenced in the affidavit itself, through a summary of the sums owed to the wholesalers.  (Doc. No. 94-13 through Doc. No. 94-20.)  Detective Straup testified that he was provided these documents prior to the search.  (Straup Dep., at 27-28.)  Accordingly, the evidence shows that any reference to "receipts" in the affidavit may very well have been one to the documents that have elsewhere been described as "invoices."  We note that in their brief, Plaintiffs tend to use the words "invoice" and "receipt" interchangeably. (Resp., at  7-8.)  In any event, for reasons already discussed, we do not find this issue to be material to the matter before us even if we assume that "receipts" and "invoices" are references to different documents.

[14] We note that Plaintiffs' response is generally light on citations to the record.  Furthermore, certain of the citations are to evidence that cannot generally be considered on summary judgment (i.e., assertions in the Complaint itself) while others are simply erroneous (i.e. citations to exhibits alleged to be appended to their Third Amended Complaint but which are not so appended). We cannot consider such evidence.

a party who does nothing."); *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029

(9th Cir. 2001); *see generally* Fed. R. Civ. P. 56(c).

Notwithstanding that failure, the uncontested evidence shows that it was objectively

reasonable for Straup to conclude that the brothers were in possession of converted goods and

that probable cause existed for the search given the statements of the wholesalers, the invoices

that supported those statements, and Straup's own observations of the similarity of goods that

had been described by one of the wholesalers and which he saw in the store.[15]  Accordingly,

summary judgment must be granted in favor of Defendant Straup as to the Section 1983 unlawful

search and seizure claim in that it was objectively reasonable for him to initiate the search and

Plaintiffs have failed to establish an issue of material fact as to whether he intentionally or

recklessly made any material misrepresentations or omissions in his affidavit.[16]

### B.  Arrest & Charges

We now consider Plaintiffs' claims for malicious prosecution under federal and state[17]

law, unlawful arrest under federal law, false imprisonment under state law, and First Amendment

---

[15] We also conclude that Plaintiffs' argument that Straup should have interviewed the brothers prior to the search is without merit.  As Straup aptly explained in his deposition, it would be imprudent to interview the targets of a search prior to its execution as it would give warning that the police suspected wrongdoing.  (Straup Dep., at 68-69.)  Such warning would give the suspects the opportunity to hide or dispose of any evidence of illegal activity and hamper any further investigation.  Even if such a step could be said to have some arguable merit, "the mere fact that a police investigation could have been more thorough does not vitiate probable cause."  *Mitchell v. Obenski,* 134 F. App'x 548, 551 (3d Cir. 2005); *see Baker v. McCollan,* 443 U.S. 137, 144-46 (1979) (finding, in a false arrest claim, that the Constitution does not require an "error-free investigation" where the officer must investigate every allegation of innocence).

[16] We find that Plaintiffs have not pointed us to any evidence that would show that any of the various statements, had they been materially false, were made intentionally or recklessly.  *See Warner,* 2005 WL 2811738, at *3; *see also Wilson,* 212 F.3d at 786.

[17] Under 28 U.S.C. 1367(c), a court may decline to exercise supplemental jurisdiction over state law claims for a variety of reasons.  We note that summary judgment on the state law malicious prosecution and false imprisonment claims hinge on the issue of probable cause, which is also squarely at issue in the federal claims.  Moreover, we note that discovery has ended and the scheduled trial date is fast approaching.  Accordingly, in the interests of "judicial economy, convenience, and fairness" we will adjudicate these state law claims.  *Borough of W. Mifflin v. Lancaster,* 45 F.3d 780, 788 (3d Cir. 1995).

retaliation under federal law. We first discuss the significance of probable cause in analyzing these claims.

### 1. The Law of Malicious Prosecution, Unlawful Arrest, & False Imprisonment

Under Section 1983, a Fourth Amendment malicious prosecution claim requires the plaintiff to prove the absence of probable cause. *Johnson v. Knorr*, 477 F.3d 75, 81-82 (3d Cir. 2007) (citing *Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir.2003)). Pennsylvania law also requires the plaintiff to establish a lack of probable cause in a malicious prosecution action. *Bradley v. Gen. Acc. Ins. Co.*, 778 A.2d 707, 710 (Pa. Super. 2001). Similarly, in a Section 1983 claim of unlawful (or false) arrest the plaintiff must show he or she was arrested without probable cause. *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988) ("The proper inquiry in a section 1983 claim based on false arrest . . . is not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had committed the offense."); *see also Lippay v. Christos*, 996 F.2d 1490, 1502 (3d Cir. 1993) ("Where a police officer causes an arrest to be made pursuant to a warrant which he obtained on the basis of statements he knew to be false or on the basis of statements he makes in reckless disregard of the truth, a plaintiff may recover damages under section 1983 for 'unreasonable seizure' of his person in violation of the Fourth Amendment.") Under Pennsylvania law, there is no false imprisonment when a police officer makes an arrest based upon probable cause, and thus Plaintiffs must show a lack of probable cause for their arrests to go forward on this claim.[18] *Renk v. City of Pittsburgh*, 651 A.2d 289, 293 (Pa. 1994).

---

[18] Plaintiffs stylized this claim as "unlawful arrest and false imprisonment" and presented it as one count in their Complaint. (Compl., ¶ 146-50.) We do not find there to be any separate tort under Pennsylvania law for unlawful

*(continued...)*

## 2. The Law of First Amendment Retaliation and Qualified Immunity

In a Section 1983 First Amendment retaliation claim for retaliatory *prosecution*, the Supreme Court has held that a plaintiff must prove the absence of probable cause. *Hartman v. Moore*, 547 U.S. 250, 265 (2006). Whether one must establish the absence of probable cause in a First Amendment retaliation claim arising out of an *arrest* is less certain.

The arrest here occurred in July 2011. (Imad Dep., at 51, 140.) At that time, and still today, it remains unclear whether an *arrest*, supported by probable cause, violates the Constitution when pursued out of retaliatory animus. *See Reichle v. Howards*, 132 S. Ct. 2088, 2096-97 (declining to hold that a retaliatory *arrest* claim may stand when probable cause is present but instead finding that, given uncertainty in the law, qualified immunity would apply in such cases); *see also Primrose v. Mellott*, 541 F. App'x 177, 180 n.2 (3d Cir. 2013) (non-precedential) (discussing *Hartman* and *Reichle* and stating that "[w]e have not decided whether the logic of *Hartman* [concerning retaliatory *prosecution* and the need to show a lack of probable cause] applies to retaliatory *arrest* claims, and so it appears that [the defendant] would be entitled to qualified immunity on the First Amendment claim." (emphasis added)). Straup asserts that this legal uncertainty protects him from civil liability.

Qualified immunity shields state actors from liability for damages under Section 1983 "unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle*, 132 S. Ct. at 2093; *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 326 (3d Cir. 2014) ("The qualified immunity analysis is . . . composed of two

---

arrest, separate from false imprisonment, and thus consider the reference to unlawful arrest to be coextensive with false imprisonment. *See Gagliardi v. Lynn*, 285 A.2d 109, 111 (Pa. 1971) (explaining that "'false arrest' is not itself a tort in the sense of being an independent source of liability" and is instead a form of false imprisonment.); *Teeple v.*

*(continued…)*

constituent questions: first, whether the plaintiff suffered a deprivation of a constitutional or statutory right; and second, if so, whether that right was 'clearly established' at the time of the alleged misconduct.").  Given that it remains unclear in this Circuit whether a retaliatory arrest claim supported by probable cause is actionable, Straup is protected by qualified immunity if the arrests, even pursued out of retaliatory animus, were supported by probable cause.  *See Primrose*, 541 F. App'x at 180 n.2*; Yazid-Mazin v. McCormick*, No. CIV.A. 13-5783 FLW, 2013 WL 5758716, at *5 (D.N.J. Oct. 24, 2013) (first amendment retaliatory arrest claim dismissed where probable cause was not claimed to be absent).  Thus, while Plaintiff might theoretically prevail on a retaliatory *arrest* claim in the face of an arrest based on probable cause by showing retaliatory animus and causation, Straup would be protected by qualified immunity given the legal uncertainty as to whether a lack of probable cause is an essential element of this cause of action.

### 3.  Probable Cause

We consider at this point the question of whether any issues of material fact exist to support Plaintiffs' position that the arrests and charged were initiated without probable cause as reflected in the affidavits sworn to by Detective Straup.  In cases for malicious prosecution, false arrest, and First Amendment retaliation as well as state law claims of false imprisonment involving an arrest, a plaintiff must show that probable cause was lacking, based on an objective standard of reasonableness given the content of the affidavit.  *See, e.g., Baird v. Aluminum Seal Co.*, 250 F.2d 595, 600-01 (3d Cir. 1957); *Barna v. City of Perth Amboy*, 42 F.3d 809, 820 (3d Cir. 1994); *Griffin v. Walbert*, No. 3:11-CV-924, 2012 WL 123560, at *4 (M.D. Pa. Jan. 17,

_____
*Carabba*, No. CIV.A. 07-2976, 2009 WL 5033964, at *17 (E.D. Pa. Dec. 22, 2009) *aff'd*, 398 F. App'x 814 (3d Cir. 2010) ("Under Pennsylvania law, the claims of false arrest and false imprisonment are coextensive.").

2012); *Kelley v. Gen. Teamsters, Chauffeurs & Helpers, Local Union 249*, 544 A.2d 940, 942 (Pa. 1988); *see generally Whren v. United States*, 517 U.S. 806, 809-14 (1996) (discussing the Fourth Amendment and its lodestar of objective reasonableness); *Gerstein v. Pugh*, 420 U.S. 103, 111-12 (1975) (probable cause for arrest is "'defined in terms of facts and circumstances 'sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.'" (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

In assessing the presence of probable cause, it is well-established that:

> [p]robable cause is present where an officer has a sufficient basis to make a "practical, common sense" decision that a "fair probability" of criminal activity exists. *Illinois v. Gates,* 462 U.S. 213, 238 (1983). The inquiry is whether "facts and circumstances within the officer's knowledge [ ] are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo,* 443 U.S. 31, 37 (1979).

*Clifton v. Borough of Eddystone*, 824 F. Supp. 2d 617, 623-24 (E.D. Pa. 2011). For much the same reasons discussed as to probable cause for the search, we find that the arrest warrants were supported by probable cause. Straup's affidavits of probable cause for the arrests of the Safa brothers expanded upon the affidavits provided in support of the search warrant as Straup now had the benefit of further interviews and the opportunity, with the help of the wholesalers, to match the goods seized with the invoices. (Doc. No. 94-5; 94-6.) As discussed *supra* in Part I.E., the affidavits in support of the arrests warrants detailed six interviews he had with the wholesalers. Through these interviews, the wholesalers presented consistent narratives that broadly substantiated a belief that the brothers were engaged in a criminal enterprise to convert the consigned jewelry to their own use without proper payment to the wholesalers. (*Id.*) The fact that the majority of the items seized after the search matched the wholesalers' invoices reinforced

their allegations and the notion that the Safas were engaged in criminal activity. (*Id.*) Where, as here, probable cause exists on the face of the warrants, Plaintiffs must establish that Straup intentionally or with a reckless disregard for the truth made material misrepresentations or omissions in the affidavits. *See, e.g. Wilson v. Russo*, 212 F.3d 781, 786 (3d Cir. 2000).

The Plaintiffs first claim that the affidavits contained falsities in that Straup stated that he had matched some of the seized property to the invoices, that the wholesalers were able to identify their items, and that some of the items were unique. (Resp., at 5, 7.) However, they point to no evidence supporting these conclusory assertions of falsity and we need not consider them. That failure alone amounts to a failure to meet their burden in opposing summary judgment. *See El*, 479 F.3d at 238; *Williams v. Borough of W. Chester, Pa.*, 891 F.2d 458, 464 (3d Cir. 1989) (on summary judgment, "the opposing party must introduce specific evidence showing that there is a genuine issue for trial." (citing *Celotex,* 477 U.S. at 322–24)); *Oxford*, 21 F.Supp.3d at 448; *Nationwide Prop. & Cas. Ins. Co. v. Feryo Hearing Aid Serv.,* Inc., 895 F. Supp. 85, 87 (E.D. Pa. 1995) ("the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion.") (citation omitted). Further, while "it is not the obligation of this Court to scour the record in an effort to affirmatively discover a factual dispute that Plaintiffs have not presented," *Domenech*, 2009 WL 1109316, at *6, our review of the record fails to disclose any genuine issues of material fact as to the truth of those statements.

Plaintiffs also argue that Straup intentionally or recklessly claimed that the brothers owned New Diamond City. (Resp., at 5.) This error is immaterial to a finding of probable cause. The claims communicated to Straup from the wholesalers showed that they often dealt directly with the sons in consigning various merchandise to New Diamond City. This is reflected in the

warrants which explained that the brothers had requested items from the wholesalers, made excuses as to their failures to pay debts on time, made assurances to pay the debt at the end of March 2010, and consequently closed up shop just as certain of those payments became due. (Doc. No. 94-5, 94-6.) Accordingly, irrespective of any ownership interest in the business, Straup had probable cause to find the two were complicit in the allegedly criminal scheme to fraudulently convert the jewelry on consignment to New Diamond City for their own use.

Plaintiffs then assert that there was no probable cause in that the invoices did not show that the wholesalers legally had title to the goods they claimed were consigned to New Diamond City. (Resp., at 7.) However, in addition to the detailed statements provided by the wholesalers, invoices which largely matched the goods seized confirmed that the wholesalers were the owners of the goods. Straup was presented with invoices from ten wholesalers, interviewed six of them in relation to the arrest warrants, and went over the seized items with the six wholesalers in order to match as many of them to invoices as possible.[19] We conclude that probable cause existed despite Plaintiffs' assertion that the ownership of the goods was unclear.

Plaintiffs also argue that the fact that one wholesaler claimed ownership to a watch that was not his should negate a finding of probable cause. We first note that Straup had excused two wholesalers from the store when they claimed entitlement to items that did not appear to be their own, putting their credibility into question. However, the fact that two of the eight complainants present at the time of the search acted in such a manner does not defeat probable cause given the

---

[19] Relatedly, for the same reasons discussed in Part V.A., we do not find that any assertion of error relating to Straup's possession of receipts would alter our analysis. There was sufficient evidence for an officer to conclude that the wholesalers owned the goods at issue irrespective of whether Straup was provided with receipts showing where and when the wholesalers had originally purchased the goods. Moreover, Plaintiffs have not cited to any evidence tending to show that Straup was not in possession of such receipts. *See El*, 479 F.3d at 238; *Domenech*, 2009 WL 1109316, at *5-6; *see generally* Fed. R. Civ. P. 56(C)(3).

remainder of the evidence recited in the affidavit. *See Petaccio v. Davis*, No. CIV.A. 02-2098, 2002 WL 32356393, at *4 (E.D. Pa. Oct. 9, 2002) *aff'd*, 76 F. App'x 442 (3d Cir. 2003) ("The identification of a party as the perpetrator of a crime by a victim or other witness provides ample probable cause to charge that party."); *see also Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432, 439 (7th Cir. 1986) ("When an officer has 'received his information from some person— normally the putative victim or an eye witness—who it seems reasonable to believe is telling the truth', he has probable cause." (quoting *Daniels v. United States,* 393 F.2d 359, 361 (D.C.Cir.1968)); *Scott v. Farrell*, No. CIV.A. 12-6049, 2013 WL 6474488, at *3 (E.D. Pa. Dec. 10, 2013) ("It is well established that an identification from a single, credible witness can be sufficient for probable cause."); *see generally, Wilson v. Russo*, 212 F.3d 781, 783 (3d Cir. 2000) (even if omissions are made with a reckless disregard for the truth, if they are immaterial to a finding of probable cause, a malicious prosecution claim cannot proceed).

Straup was presented with hundreds of items that matched the invoices he was provided with and corroborated the claims of the other six complainants, allowing any reasonable officer to fairly conclude that the Safas had taken part in illegal activity. While the acts of the two troublesome wholesalers reflected poorly on their own credibility, they did not negate Straup's ability to rely on the remainder of the evidence before him.

Accordingly, we find that no issues of material fact exist as to the establishment of probable cause for the arrests of the Safa brothers and for the charges ultimately lodged against them. We also conclude that Straup did not intentionally or recklessly make any misrepresentations or omissions material to that finding. Summary judgment must be granted as to the unlawful arrest, false imprisonment, malicious prosecution, and First Amendment retaliation claims in that recovery on each of these claims requires Plaintiffs to show that

probable cause was lacking, either as an essential element of the cause of action or, in the case of retaliatory arrest, in order to overcome qualified immunity.[20]

## C. Conversion

In that our grant of summary judgment on the Section 1983 claims divests this Court of federal question jurisdiction, we must consider whether to exercise supplemental jurisdiction over the remaining state law conversion claim.  *See* 28 U.S.C. § 1367(c)(3).  We had no difficulty with that decision with respect to the Plaintiffs' state law claims which so closely paralleled their Section 1983 counterparts.  Similarly, we have no difficulty here.  We note the close relationship between the conversion claim and the claims we have already addressed and also note that this case has progressed to the point where it is less than two weeks before the start of trial.  Mindful of the importance of "judicial economy, convenience, and fairness to the parties," *Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995), and given the straightforward nature of the remaining legal claim, we choose to exercise supplemental

---

[20] Moreover, under Section 1983, in false arrest cases where an officer arrests an individual pursuant to a warrant, qualified immunity shields the officer from damages liability unless "the warrant application is 'so lacking in indicia of probable cause as to render official belief in its existence unreasonable.'"  *Orsatti v. New Jersey State Police*, 71 F.3d 480, 483 (3d Cir. 1995) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1984)); *see also Hunter v. Bryant*, 502 U.S. 224, 227 (1991) ("qualified immunity shields [officers] from suit for damages if 'a reasonable officer could have believed [the arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed.' Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)); *Mitchell*, 134 Fed. App. at 551 (qualified immunity attaches in wrongful arrest claim where "it would not have been clear to a reasonable officer that probable cause was lacking.").  As to Section 1983 claims more generally, if a "reasonable officer could have believed that this or her conduct was lawful, in light of the clearly established law and the information in the officer's possession," he is protected by qualified immunity.  *Sharrar v. Felsing*, 128 F.3d 810, 826 (3d Cir. 1997) (further noting that "law enforcement officials who 'reasonably but mistakenly' conclude that their conduct comports with the requirements of the Fourth Amendment are entitled to immunity."(citations omitted)).  In that we find that probable cause existed for both the search, arrest, and ultimately the charges lodged against the Safas and that Straup's belief in the existence of probable cause would therefore have been reasonable, Straup is also immune from liability for damages as pertains to the Section 1983 unlawful search and seizure, false arrest, and malicious prosecution claims.

jurisdiction and will rule on Defendants' Motion for Summary Judgment with regards to this claim.

Plaintiffs claim that certain of the items seized by the police were missing when the remainder of the items were returned to them and that, consequently, Straup is liable for conversion. Under Pennsylvania law "[c]onversion is the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification." *Shonberger v. Oswell*, 530 A.2d 112, 114 (Pa. Super. 1987). We have already found that at the time of the original seizure, probable cause objectively existed for the seizure of the items by law enforcement and thus it cannot be found that the original seizure was "without lawful justification." *Id.*

However, the issue remains whether a reasonable factfinder could find that Straup thereafter converted any of the items at issue to his own use.[21] Defendants assert that there is insufficient evidence for such a finding insofar as there is only Plaintiffs' bare allegation that items were missing and no specific evidence linking Straup to the unlawful conversion of any specific items.[22] (MSJ, at 31-33.) Plaintiffs provide but three short paragraphs in their Response

---

[21] This particular theory was not proposed by Plaintiffs. Their briefing appears to focus entirely on the assertion that Straup is liable for conversion by virtue of a lack of probable cause for the initial seizure. (Resp., at 14-15.) Defendants, in their Motion, however, have broached the issue as to whether Straup could be found to have taken the items after the initial seizure. (MSJ, at 31-32.)

[22] Defendants appear to request that sanctions be imposed on the Plaintiffs by virtue of their destruction of significant evidence relevant to their conversion claim. (MSJ, at 32-34.) We note that the record before us may very well support sanctions for spoliation, however, insofar as this could give rise to a spoliation inference, such inferences are not mandatory presumptions, and given the standard of review on summary judgment, we would not, in any event, make any inferences in the movants favor. *See Gurvey v. Fixzit Nat. Install Servs., Inc.*, No. CIV. 06-1779 DRD, 2011 WL 550628, at *5 (D.N.J. Feb. 8, 2011) (spoliation inference is not a mandatory presumption and finding that "[e]ven if Plaintiffs were entitled to a spoliation inference, that inference alone could not be the basis for an award of summary judgment."); *Pictures Corp. v. Davis*, 234 F.R.D. 102, 113 (E.D. Pa. 2005) (noting that the court was aware of no cases where "a court has used the spoliation inference to determine an issue of fact in favor of granting summary judgment"); *see generally United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (on summary judgment, inferences are to be made in favor of the non-moving party).

where they state, in conclusory fashion, that items were missing upon return and that Straup is thus liable for conversion, without citation to any particular exhibit, deposition, or other form of evidence. (Resp., at 14-15.) We will not consider Plaintiffs' conclusory legal allegations as substantive evidence. *See Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d. Cir. 2006)) ("summary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument"); *see also Oxford Investments, L.P. v. City of Philadelphia*, 21 F.Supp.3d 442, 448 (E.D. Pa. May 15, 2014); *see generally* Fed. R. Civ. P. 56(c).

Mohammad Safa, at his deposition, claimed that approximately three solitaire rings, part of three separate ring sets, were missing from the 491 items originally seized from the police and that there were other items missing as well, the specifics of which were not set out in the record before us.[23] (Mohammad Dep., at 46.) Mohammad claimed the missing items were valued collectively at approximately $100,000. (*Id.* at 47.) Of the remaining items, we have only been provided one piece of documentary evidence of the disposition of the merchandise, a receipt for $3,632.00 for melted down items. (Doc. No. 94-39.) Significantly, Plaintiffs have pointed us to no evidence concerning how the goods were retained by law enforcement after the seizure, how they were dealt with during the court proceedings antecedent to this case, and in what manner they were actually returned to the Safas. In Straup's deposition testimony he testified that the

---

[23] A document attached to Plaintiffs' brief, a letter from the Safas' previous attorney, asserts that a certain weight of goods is also missing without any reference to what specific items were claimed to be subject to conversion. (Doc. 97, at 61-62.) This missing "weight" was also described by Mohammad Safa in his deposition. (Mohammad Dep., at 45-46.) The letter sets out that the weight of the returned goods included on one property receipt was found to be significantly less than the property receipt stated, suggesting that certain goods went missing since they were initially weighed. (*Id.*) We note that the relevant property receipt in the record before us lacks any reference to weight and that the Safas have

*(continued…)*

seized property was given to an evidence custodian who matched the items with photographs of the items as well as a property receipt prior to checking them in.  (Straup Dep., at 58, 60-62, 97.)  While the items were seized in June 2011, they were not returned to the Safas until May 2013.  Plaintiffs have presented us no evidence relevant to the retention and disposition of the items, or Straup's access to the items, over that time period.

Even assuming the evidence is sufficient to show that items were converted, given that Straup, four other policemen, and a number of wholesalers were involved in the seizure and the evidence was later retained by an evidence custodian for an extended period of time, (Straup Dep., at 36, 45, 57), a jury would only be able to blindly speculate that Straup was the perpetrator.  *See Williams v. Borough of W. Chester, Pa.*, 891 F.2d 458, 460 (3d Cir. 1989) (to survive summary judgment, "a nonmoving party must adduce more than a mere scintilla of evidence in its favor"); *Chem. Bank v. Dippolito*, 897 F. Supp. 221, 223 (E.D. Pa. 1995) ("the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion.").  We have been provided no evidence as to when or how the items were taken, let alone evidence pertaining to Straup's role in this claim.  All that is before us is the claim that at some point between the seizure and the return of the seized items, certain items were not returned to the Safas.  We find that Plaintiffs have failed to meet their burden on summary judgment.  Given the bare record presented to us, no reasonable factfinder could find Straup liable for conversion.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986) (for an issue in dispute to be genuine, there must be sufficient evidence whereby "a reasonable jury could return a verdict for the nonmoving party" and noting

_____

not pointed to any of the specific items on that receipt that they alleged were missing.  (Doc. No. 94-25, at 12-14.)

that summary judgment may be granted "[i]f the evidence is merely colorable or not significantly probative" (citations omitted)); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). Summary judgment must be entered on the conversion claim.

## 4. CONCLUSION

We have found that there are no genuine issues of material fact as to the outstanding claims against the Defendants, and that Defendants' Motion for Summary Judgment must be granted. Plaintiffs have withdrawn their intentional infliction of emotional distress, conspiracy, and assault and battery claims. These claims are dismissed. There is no basis to find the City liable under a *Monell* theory or for state law malicious prosecution and Plaintiffs have not argued otherwise. Moreover, there objectively existed probable cause for the search and seizure of the Plaintiffs' store and merchandise as well as probable cause for their arrest and the charges lodged against them. Accordingly, Defendants' Motion for Summary Judgment must be granted as to the First Amendment retaliation, unlawful search and seizure, malicious prosecution, unlawful arrest, false imprisonment, and *Monell* claims. Further, there is insufficient evidence by which a reasonable factfinder could find that Straup is liable for conversion and summary judgment is granted as to that claim as well. The John and Jane Doe defendants are also dismissed. An appropriate order follows.

BY THE COURT:

/s/ David R. Strawbridge
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE